## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **GARY ADKISON, LANITA ADKISON,** | § | |
| **BRITTANY KING, Individually and as Heir** | § | |
| **of the Estate of RYAN KING, and as next** | § | |
| **friend for B.S.K. and B.A.K., Minors,** | § | |
| **and Heirs of the Estate of RYAN KING, and** | § | |
| **HOLLY ADKISON CRAYCRAFT, as next** | § | |
| **friend for K.G.A., a Minor and Heir of the** | § | |
| **Estate of BRYSON ADKISON,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 3:18-cv-02014-M** |
| | § | |
| **POLARIS INDUSTRIES, INC. ("Polaris** | § | **Jury Trial Requested** |
| **Industries"), POLARIS INDUSTRIES, INC.** | § | |
| **("Polaris of Delaware"), POLARIS SALES,** | § | |
| **INC. ("Polaris Sales"),** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

---

## DEFENDANTS POLARIS INDUSTRIES, INC. AND POLARIS SALES, INC.'S BRIEF
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................. 3

    A.    **Plaintiffs' Out-Of-State ORV Trips and Gary Adkison's Refusal to Service the RZR** ................................... 3

    B.    **Plaintiffs' ORV Accident In Colorado** ............................... 3

    C.    **The Accident Investigation** ............................................. 5

    D.    **Plaintiffs' Claims Against Polaris** ................................... 6

    E.    **Plaintiffs' Claims For Non-Economic Damages** .............. 6

    F.    **Plaintiffs' Claims For Exemplary Damages** ................... 7

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT .................................................................................................................... 9

    I.    **COLORADO LAW APPLIES TO PLAINTIFFS' CLAIMS FOR NON-ECONOMIC AND EXEMPLARY DAMAGES.** ........................... 9

        A.    **Colorado And Texas Law Conflict On Non-Economic And Exemplary Damages** ................................... 10

        B.    **Under the Most Significant Relationship Test, Colorado Law Applies To Plaintiffs' Claims** ................... 11

    II.    **PLAINTIFFS' CLAIM FOR EXEMPLARY DAMAGES IS NOT RECOVERABLE UNDER COLORADO (OR TEXAS) LAW** ....................... 17

        A.    **Polaris Extensively Tested Its Products To Protect Riders' Safety** ........................................................ 18

        B.    **Polaris Remedied The Earlier Transmission Lock-Up Issue** ................................................................... 19

        C.    **Polaris Provided Proper Warnings That, If Heeded, Would Have Prevented Plaintiffs' Accident** ............ 19

    III.    **PLAINTIFFS' CLAIMS REGARDING THE ALLEGED TRANSMISSION FAILURE SHOULD BE DISMISSED AS A MATTER OF LAW** ........................... 20

i

**A.**     **Texas Law Requires Plaintiffs to Prove That The Transmission Lock-Up Was Both A Cause in Fact and The Proximate Cause of the Accident** ................................. 20

**B.**     **The Transmission Lock-Up Was Not A Cause In Fact Of The Accident** .............................................................. 21

**C.**     **The Accident Was Not A Foreseeable Result Of The Transmission Lock-Up** .................................................. 22

       **a.**     **This Type of Accident is not a Reasonably Foreseeable Result of A Transmission Lock-Up** .................. 23

       **b.**     **Foreseeability Is Negated Because The Forces Generated By The Transmission Lock-Up Had Come To Rest Without Injury** .................................. 24

       **c.**     **Plaintiffs' Decision To Coast Down The Mountain In Neutral Was A Superseding Cause That Negates Foreseeability** ................................ 25

            **i.**     **Plaintiffs' Conduct Brought About A Different Kind Of Harm Than The Transmission Lock-Up Otherwise Would Have** ................................................... 26

            **ii.**     **Plaintiffs' Reckless Decisions Were Extraordinary, Not Normal.** ......................... 26

            **iii.**     **Plaintiffs' Accident Is Not The Normal Result Of The Situation Created By The Transmission Lock-Up** .............................. 27

            **iv.**     **Plaintiffs' Accident Was Caused By Their Careless Decisions and Reckless Actions** ..................... 27

            **v.**     **Plaintiff Gary Adkison's Decision To Coast Down The Mountain In Neutral Was Wrongful And Subjects Him To Liability** .............................................. 27

            **vi.**     **Plaintiff Gary Adkison's Decision To Coast Down The Mountain In Neutral Is Highly Culpable** ........................................... 27

**D.**     **Plaintiffs Cannot Prove Their Marketing Defect Claim** ..................... 28

CONCLUSION ........................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................8

*Cowart v. Kmart Corp.*,
    20 S.W.3d 779 (Tex. App. 2000)................................................................23, 28

*Dew v. Crown Derrick Erectors, Inc.*,
    208 S.W.3d 448 (Tex. 2006)...........................................................................27

*Duncan v. Cessna Aircraft Co.*,
    665 S.W.2d 414 (Tex. 1984).....................................................................9, 11, 12

*Fields v. City of S. Houston*,
    922 F.2d 1183 (5th Cir. 1991) ...........................................................................8

*G.M.C. v. Harper*,
    61 S.W.3d 118 (Tex. App. 2001)......................................................................22

*Gates v. Tex. Dep't of Protective & Regulatory Servs.*,
    537 F.3d 404 (5th Cir. 2008) .............................................................................8

*General Elec. Co. v. Niemet*,
    866 P.2d 1361 (Colo. 1994)........................................................................16, 17

*Gooch v. Packaging Corp. of America, Inc.*,
    2019 WL 3219224 (S.D. Tex. July 17, 2019).....................................................11

*Grabau v. Target Corp.*,
    2008 WL 179442 (D. Colo. Jan. 17, 2008)........................................................19

*Hooper v. Marriott Int'l, Inc.*,
    979 F. Supp.2d 735 (N.D. Tex. 2013) ..............................................................14

*Hughes Wood Prods., Inc. v. Wagner*,
    18 S.W.3d 202 (Tex. 2000).........................................................................9, 11

*IHS Cedars Treatment Ctr of DeSoto, Tex., Inc. v. Mason*,
    143 S.W.3d 794 (Tex. 2004)....................................................................22, 23, 24

*Lear Siegler, Inc. v. Perez*,
   819 S.W.2d 470 (Tex. 1991) ................................................................................23

*Lockwood Corp. v. Black*,
   669 F.2d 324 (5th Cir. 1982) ................................................................................9

*Lynch Props., Inc. v. Potomac Ins. Co.*,
   140 F.3d 622 (5th Cir. 1998) .............................................................................8, 9

*Mitson v. AG Eng'g & Dev. Co.*,
   835 F. Supp. 572 (D. Colo. 1993) .......................................................................18

*Morris v. Cessna Aircraft Co.*,
   833 F. Supp. 2d 622. (N.D. Tex. 2011) ...............................................................19

*Old Republic Ins. Co. v. Durango Air Serv, Inc.*,
   283 F.3d 1222 (10th Cir. 2002) ..........................................................................18

*Phan Son Van v. Pena*,
   990 S.W.2d 751 (Tex. 1999)...........................................23, 27, 28, 29, 30, 31

*Rampersad v. CenterPoint Energy Hous. Elec., LLC*,
   554 S.W.3d 29 (Tex. App. 2017)..................................22, 23, 24, 25, 26, 27

*Schneider Nat'l Transp. v. Ford Motor Co.*,
   280 F.3d 532 (5th Cir. 2002) ..............................................................................22

*Shaw v. Trinity Highway Prods., LLC*,
   329 S.W.3d 914 (Tex. App. 2010).........................................................22, 23, 31

*Sulak v. Am. Eurocopter Corp.*,
   901 F. Supp. 2d 834 (N.D. Tex. 2012) ...............................................................13

*Swartz v. Textron Ground Support Equipment Inc.*,
   2020 WL 4000859 (N.D. Tex. July 15, 2020) ....................................................13

*Tobin v. AMR Corp.*,
   637 F. Supp. 2d 406 (N.D. Tex. 2009) ..........................................................11, 12

*Toyota Motor Co. v. Cook*,
   581 S.W.3d 278 (Tex. App. 2019)..........................................................13, 15, 16

*Wollam v. Wright Med. Grp., Inc.*,
   2012 WL 4510695 (D. Colo. Sept. 30, 2012).....................................................20

iv

**Statutes**

Colo. Rev. Stat. §§ 13-21-102, et seq....................................................9, 10, 11, 16, 18, 19, 20, 21

Colo. Rev. Stat. § 13-21-203(1)(a) ........................................................................................10

Colo. Rev. Stat. § 42-4-1009 ...............................................................................................30

Colo. Rev. Stat. § 42-4-1402 ...........................................................................................30, 31

Tex. Civ. Prac. & Rem. Code § 41.003(a) ...........................................................................10, 19

Tex. Civ. Prac. & Rem. Code § 41.008(b) ...............................................................................11

Tex. Civ. Prac. & Rem. Code § 74.301 ...................................................................................15

Tex. Civ. Prac. & Rem. Code § 82.005(a)(2) ...........................................................................22

**Other Authorities**

Fed. R. Civ. P. 56(a) .............................................................................................................8

Restatement (Second) of Conflict of Laws § 6..........................................................11, 12, 14

Restatement (Second) of Conflict of Laws § 145..................................................................11

Restatement (Second) of Torts § 442 ......................................................................................27

## INTRODUCTION

This lawsuit arises from a tragic accident in which Gary, LaNita, and Bryson Adkison and Ryan King (collectively, "Plaintiffs") were coasting down a steep mountain pass in Colorado in Gary Adkison's 2011 Polaris RZR 4 800 (the "Subject RZR") when he lost control of the vehicle and caused it to veer off the path and roll multiple times into the Cement Creek ravine.  Gary and Lanita Adkison, the driver and front-seat passenger, suffered physical injuries from the accident while their son Bryson Adkison and son-in-law Ryan King, who were seated in the second row, died.

This accident was the result of a series of reckless decisions, primarily by Gary Adkison. Moreover, it was completely avoidable. When Plaintiffs were near the top of the mountain, the Subject RZR's transmission allegedly "locked up," rendering the vehicle inoperable and immovable while it was in gear. At that point, the vehicle was at rest and Plaintiffs were safe. Rather than walking down the three-mile trail, waiting for help, or accepting a ride down the mountain that was offered by a passing truck, Plaintiffs decided to coast down the steep mountain trail in neutral without wearing seatbelts or helmets. While doing so, Gary Adkison rode the vehicle's brakes excessively—to the point that he noticed that they were getting "soft," "spongy", and felt like they were going to give out—until they allegedly failed, causing him to lose control of the vehicle. These actions violated multiple Colorado laws and ignored many of Polaris's explicit safety warnings. In fact, they also led the Colorado police to recommend charging Gary Adkison criminally for careless driving causing bodily injury and death.

In this lawsuit, Plaintiffs have asserted claims against Polaris for design defect, marketing defect, and negligence. Each of these claims allege a defect in both the Subject RZR's transmission and its braking system. Plaintiffs are also seeking exemplary damages.

1

Polaris moves for partial summary judgment on three issues:

*First,* using Texas's choice of law principles and the "most significant relationship test" that Texas courts have adopted, Colorado law applies to Plaintiffs' claims. The accident occurred in Colorado. The conduct that lead to the accident occurred in Colorado. Other than the Plaintiffs residing in Texas, virtually every material factor in the choice of law analysis weighs in favor of applying Colorado law. Making this choice of law determination now is important because: (a) Texas and Colorado law conflict significantly regarding both the standard and the applicable damages caps for non-economic damages and exemplary damages; and (b) Polaris is moving for summary judgment on Plaintiffs' claim for exemplary damages; and (c) it will enable the parties to properly prepare this case for trial, which is scheduled for August 2021.

*Second*, Plaintiffs' claims for exemplary damages should be dismissed because there is no record evidence to support a finding that Polaris committed "fraud, malice, or willful and wanton conduct" when designing or marketing the Subject RZR. In fact, the record demonstrates the opposite, as Polaris appropriately designed and tested the Subject RZR and provided proper instructions and safety warnings to its customers.

*Third*, Plaintiffs' design defect, marketing, and negligence claims should be dismissed to the extent that they are based on an alleged transmission defect in the Subject RZR. The transmission "lock-up" was not the cause in fact of the accident, the accident was not a foreseeable result of the lock-up, and Plaintiffs' multiple reckless actions after the vehicle locked up and came to a rest were superseding causes of the accident.

## FACTS

### A.    Plaintiffs' Out-Of-State ORV Trips and Gary Adkison's Refusal to Service the RZR.

The Adkisons frequently took trips to other states to ride their ORVs, during which they would typically put 300-400 miles on the ORVs in a single trip. (A002-A005, A007-A010.) They had taken seven or eight such trips to Colorado alone. (A004.) They have also taken out-of-state ORV trips to Louisiana (four or five times), Arkansas (three or four times), and Utah (one time). (A004-A005.) In fact, on the Utah trip in the summer of 2015, one year before the accident, Gary Adkison took the Subject RZR to a Honda ORV dealership to be serviced. (A014-033, A131-A133.) The certified mechanic told him that the Subject RZR had a high idle and recommended having the transmission serviced. (A025-A026, A132.) Mr. Adkison refused to get the repair (A025, A132.) The mechanic also noted that the rear brake pads were near their service limit. (A026-A032.) Mr. Adkison did not have the brake pads changed either. (A031-A032.)

The Adkisons "very seldom" used their ORVs at home in Texas. (A011-A012.) Before one of their out-of-state trips, they had to put a new battery in the ORV because the vehicle had been sitting unused for so long in Texas. (A011-A012.)

### B.    Plaintiffs' ORV Accident In Colorado.

The Adkisons' trip to Colorado in 2016 was scheduled to last for seven days. (A035-A039.) They traveled to Silverton, Colorado, the destination of each of "six or seven" previous Colorado trips over the years. (A037-A038, A009-A010.) On August 16, 2016, the second to last day of their trip, Plaintiff Gary Adkison drove three other adult members of his family—Lanita Adkison, Bryson Adkison, and Ryan King—up a mountain in the Subject RZR. (A040-A041.) When they stopped at the top of the mountain, the vehicle's transmission locked up, making it impossible to shift into gear and drive. (A042-A046.) Rather than walking down the mountain, and despite his

3

wife's significant safety concerns, Gary Adkison decided that the family would coast down the mountain in neutral while he applied the brakes to slow the vehicle down as needed. (A047-A052.) The Subject RZR's Owner's Manual explicitly warns against coasting down a hill, stating "Always descend a hill with the transmission in forward gear. Never descend a hill with the transmission in neutral." (A089.) Its warnings stated that "descending hills improperly" could "cause loss of control or overturn." (A089.) Several times, when the road flattened or reached an incline and the vehicle's momentum would not carry it any further, Plaintiffs got out of the vehicle, pushed it to the next downward slope, and then got back into the Subject RZR and began coasting down the mountain again. (A052-A053, A064-A065.)

Gary Adkison "was fully aware how brakes work" and knew that if the brakes became too hot as a result of friction, they would fail. (A053-A054.) According to Mr. Adkison, he therefore tried to apply the brakes in a manner that would minimize heat. (A054.) He would "let it build up a little speed" and then "slow it way down." (A053.) As he coasted the vehicle, Mr. Adkison noticed that the brakes began to feel "like they were getting hot" and "spongy" and "a little less like they wanted to stop." (A055, A059.) But Mr. Adkison says he "expected that." (A055.) Instead of stopping the ride and waiting for the brakes to cool or walking down the remainder of the trail, Mr. Adkison testified that he "just tried to stay off [the brake] more." (A055.)

About a half-mile from the bottom of the mountain, Plaintiffs stopped and talked to another driver in a pickup truck who agreed to turn around at the top of the mountain and come back to help them. (A056-A058, A068.) Gary Adkison kept his foot on the brake the entire time of the stop. (A063.) Rather than waiting a few minutes for the truck to return, Mr. Adkison chose to resume coasting down the mountain in neutral. (A059-A061.) Shortly thereafter, according to Mr. Adkison, the brakes failed completely, and he lost control of the vehicle on the final curve in the

road. (A063, A066-A067, A073.) The Subject RZR left the road and rolled down a rocky 75-foot embankment. (A073, A106.) None of the vehicle occupants were wearing their seatbelts or a helmet. (A051.) The subject vehicle was also equipped with door nets, however none of the door nets were closed or buckled at the time of the accident. In addition to suffering his own relatively minor injuries, Gary Adkison's wife Lanita was seriously injured, and his adult son Bryson Adkison and son-in-law Ryan King were killed. (A078-A079.)

### C.    The Accident Investigation.

The Colorado police officers who arrived at the scene and investigated the accident determined that the Subject RZR's brakes were operational following the accident. (A075-A077.) Gary Adkison was conscious and able to give a statement to the police about what had happened. (A106.) The police accident report indicated that Mr. Adkison was, at the time of the accident, unable to slow due to "brake fade/excessive braking" and was "traveling too fast to negotiate curve." (A110.) According to the report, Mr. Adkison repeatedly told the police that he had "killed his son." (A106-A107, A142.) and "asked [Sheriff Conrad] if [he] would shoot him in the head, stating that he couldn't bear killing his sons." (A142.) The report further records Mr. Adkison's statements at the scene of the accident as follows (A106):

> He decided to try and coast down the mountain, and admitted that was a "stupid idea." As he spoke he kept repeating that he killed his son. He stated that his brakes started to fade. Even so, he decided to not stop at a level area but to keep going down the hill. He stated his brakes became un-usable due to over use and he was unable to control his speed. He told me as they got close to the last right hand curve his brakes were completely useless and he could not negotiate the curve, but instead he travelled off the left side of the road and down into the ravine.

The police recommended to the district attorney that Mr. Adkison be charged with two counts of careless driving causing death and one count of careless driving causing bodily injury. (A107, A069.)

5

### D.      Plaintiffs' Claims Against Polaris.

Plaintiffs' Third Amended Complaint asserts claims against Polaris for design defect, marketing defect, and negligence relating to both the transmission and the braking system of the Subject RZR. (A120-A125 at ¶¶24-27.) As to the transmission, Plaintiffs allege in their design defect claim that "the transmission would 'lock-up' due to a problem in the main gear set in the 'bucket housing' of the transmission." (A117-A118 ¶15.) According to Plaintiffs, "[w]hen the transmission locked up, this rendered the engine and machine useless and denied the Adkison family the benefit of engine braking deceleration that would have been present had the transmission not failed." (A120 ¶22.) This allegedly "contributed to the overheating of the braking system and contributed to cause the crash." (A120 ¶22.)

In their defective marketing claim, Plaintiffs allege that Polaris failed to warn and instruct users as to "the substantial risk of a severe crash due to the transmission lock-up, brake system failure, and lack of secondary emergency friction brakes." (A122-123 ¶25.)

Finally, in their negligence claim, Plaintiffs allege that Polaris was negligent in "failing to take steps to prevent transmission failure which caused braking failure." (A123-124 ¶25.)

### E.      Plaintiffs' Claims For Non-Economic Damages.

In addition to economic damages, Plaintiffs are seeking non-economic damages for mental anguish and loss of companionship and society. (A146-147, A150-152, A159-160, A164-166.) These alleged non-economic damages, which Plaintiffs' economics expert Gary Kronrad purports to calculate, far exceed their alleged economic damages. (A148-152, A162-166.) Kronrad's opinion on non-economic damages assigns a value of $0.01 for each waking second of the anticipated lifetime of each Plaintiff or decedent.[1] (A150-152, A164-166.) In sum, Kronrad

---

[1] Mr. Kronrad's "expert" calculation has no basis in science, evidence, or law. A similar opinion of his was excluded for lacking a proper basis and not being helpful to the jury. *Smith v. Chrysler Group, LLC*, No. 1-CV-218, 2017 WL

estimates that Plaintiffs' non-economic damages total over $79 million, broken down as follows (A150-152, A164-166):

| | |
|---|---|
| Gary Adkison (as father of Bryson): | $ 9,269,294 |
| Lanita Adkison (as mother of Bryson): | $ 14,489,510 |
| Kennedy Adkison (as daughter of Bryson): | $ 13,819,300 |
| Brittany King (as wife of Ryan): | $ 13,036,091 |
| Britton King (as daughter Ryan): | $ 14,224,100 |
| Beckham King (as son of Ryan): | $ 14,264,897 |

### F.    Plaintiffs' Claims For Exemplary Damages.

Plaintiffs have also asserted a claim for exemplary damages in an unspecified amount. (A125 ¶28i.) There is no record evidence that Polaris acted with fraud, malice, or willful and wanton indifference when designing and marketing the Subject RZR. In fact, Plaintiffs have not even alleged fraud or malice against Polaris. (A112-A130.) As for willful and wanton conduct, the record evidence shows that Polaris carefully designed, tested, and warned about how to use its product.

The record evidence demonstrates that Polaris spent thousands of hours each year testing the safety of its vehicles. (A186.) Polaris's safety testing included specific tests for stability, braking, and occupant protection. (A186.) It tested high-temperature brake operation to the point at which the brake fluid and brake pad adhesives experience deterioration. (A136-A138, A186.) Additionally, Polaris performed brake fade testing to the point of complete failure. (A139-140.)

Polaris also identified and remedied the transmission design issues. In particular, certain Polaris RZRs experienced a "lock-up" issue related to the 2010 model-year's new transmission

---

7788130, *2 (E.D. Tex. June 8, 2017). Polaris intends to challenge the admissibility of Mr. Kronrad's opinions prior to the trial.

14588234 v1

design. (A218-A222.) Polaris identified that problem and promptly remedied it by: (1) reverting to the 2009 transmission design, which did not have any "lock-up" issues, for any RZRs that had yet to be assembled at that time; and (2) implementing design modifications to the transmission for future model-year RZRs. (A216-A219.)  The transmission in the Subject RZR was not the 2010 model year transmission that had "lock-up" issues, but rather was the improved transmission design used in the 2011 model-year RZRs. (A220-A221.)

Additionally, Polaris gave specific warnings, both in the owner's manual and in the vehicle itself, for the purpose of protecting riders' safety. (A083-A104.) These warnings included:

- Get off and walk if conditions require (A102.)

- Improperly descending a hill could cause loss of control and overturn (A090.)

- Always descend down a hill with the transmission in forward gear (A090, A105.)

- Never descend down a hill with the transmission in neutral (A090, A105.)

- Never travel down a hill at high speed (A090, A105.)

- Apply the brakes lightly to aid in slowing (A105.)

- Always wear seatbelts (A098, A102, A103.)

- Always wear helmets and protective gear (A083, A086, A100, A101.)

- Always use the vehicle's door nets (A098.)

Plaintiffs violated each of these warnings while descending the hill prior to the accident.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could return a verdict for the non-moving party, then there is a genuine dispute of material fact. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417

8

(5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate, by designating specific facts beyond the pleadings that prove the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 250; *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). In determining whether a genuine dispute of material fact exists, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch Props.*, 140 F.3d at 625 (citation omitted).

## ARGUMENT

### I.     COLORADO LAW APPLIES TO PLAINTIFFS' CLAIMS FOR NON-ECONOMIC AND EXEMPLARY DAMAGES.[2]

A federal court sitting in diversity applies the forum state's choice of law rules to determine the controlling substantive law. *Lockwood Corp. v. Black*, 669 F.2d 324, 327 (5th Cir. 1982). Under Texas's choice of law rules, the Court must first determine whether the applicable laws from the potentially interested jurisdictions differ or conflict.  If, as here, they do conflict, Courts then apply the multi-factor "most significant relationship" test to determine which state's laws apply. *Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex. 2000).  Colorado and Texas

---

[2] The determination of the applicable law for this case at this stage is important because, in addition to allowing the Court to rule on Polaris's Motion regarding Plaintiffs' claim for exemplary damages, it will affect many critical issues related to the trial, including the jury instructions, the applicable legal standard governing Plaintiffs' claims, and the quantum of Plaintiffs' non-economic and exemplary damages.

law do conflict in important ways and the most significant relationship test factors weigh heavily

in favor of applying Colorado law to Plaintiffs' claims.

      A.      **Colorado And Texas Law Conflict On Non-Economic And Exemplary Damages.**

Colorado and Texas law conflict as to (1) whether non-economic damages are capped; and

(2) the applicable standard for recovering exemplary damages.

***Non-economic Damages.***  Texas law does not limit non-economic damages in product

liability or negligence cases (other than in medical malpractice cases). Colorado law does. By

statute, Colorado law generally caps non-economic damages for a person alleging an injury at

$468,010. COLO. REV. STAT. § 13-21-102.5(3)(a).[3]   For "derivative" non-economic damages,

which are defined as damages suffered by someone *other* than the person(s) who suffered the direct

injury, non-economic damages are only available if the court finds a justification for such damages

by "clear and convincing evidence." COLO. REV. STAT. § 13-21-102.5(3)(b). If a court allows

non-economic damages to a derivative plaintiff, any such award is capped at $468,010. *Id.* In

wrongful death cases, these same caps generally apply. COLO. REV. STAT. § 13-21-203(1)(a). In

sum, Texas and Colorado law materially differ with respect to limitations on non-economic

damages.

***Exemplary Damages.***  Both Texas and Colorado have statutes that limit exemplary

damages. However, those statutes materially differ in two ways: (1) the burden that Plaintiff must

meet to obtain exemplary damages; and (2) the applicable limits for exemplary damages. To

---

[3] Pursuant to § 13-21-102.5(3)(c)(I), the amounts of these statutory caps on non-economic damages, which were originally $250,000 and $500,000, respectively, have been adjusted for inflation for "all claims for relief that accrue on and after January 1, 2008, and before January 1, 2020." Pursuant to § 13-80-108(1)–(2), "a cause of action for injury to person . . . shall be considered to accrue on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence," and "[a] cause of action for wrongful death shall be considered to accrue on the date of death."

10

recover exemplary damages under Texas law, Plaintiffs must prove by "clear and convincing evidence" that the harm at issue resulted from "fraud, malice, or gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). Under Colorado law, Plaintiffs must prove "beyond a reasonable doubt" that the injury or death is attended by circumstances of "fraud, malice, or willful and wanton conduct." COLO. REV. STAT. §§ 13-21-102(1)(a), 13-21-203(3)(a), 13-25-127(2). In Colorado, "willful and wanton conduct" means "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." COLO. REV. STAT. § 13-21-102(1)(b). Thus, as to both the standard of proof and the minimum required culpability ("gross negligence" vs. "willful and wanton conduct"), Texas and Colorado law conflict.

Texas and Colorado law also apply different statutory caps on exemplary damages. The Texas statute caps exemplary damages at the greater of (1) two times the amount economic damages plus non-economic damages of up to $750,000, or (2) $200,000. TEX. CIV. PRAC. & REM. CODE § 41.008(b). The Colorado statute caps exemplary damages at the amount of actual damages. COLO. REV. STAT. §§ 13-21-102(1)(a), 13-21-203(3)(a).

### B.  Under the Most Significant Relationship Test, Colorado Law Applies To Plaintiffs' Claims.

To determine choice of law issues, Texas applies the "most significant relationship" test, as set forth in the Restatement (Second) of Conflict of Laws §§ 6 and 145. *Hughes Wood Prods., Inc.* 18 S.W.3d at 205; *Duncan,* 665 S.W.2d at 421. In applying this test, the court must consider: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. *Duncan,* 665 S.W.2d at 421; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). These factors

are evaluated qualitatively, as some are more important than others. *Duncan,* 665 S.W.2d at 421. Specifically, in tort cases, the primary consideration is the "state where the injury occurred," which "will usually be" the applicable law. *Tobin v. AMR Corp.*, 637 F. Supp. 2d 406, 412 (N.D. Tex. 2009) (internal quotation omitted). The "residence of the plaintiff" and "the principal place of business of the Decedents employer" are "factors that are entitled to less weight than the place of injury, the place of the conduct causing the injury, and the place where the parties' relationship is centered." *Gooch v. Packaging Corp. of America, Inc.*, No. H-17-1673, 2019 WL 3219224, at *9 (S.D. Tex. July 17, 2019).

In addition, the policy considerations that guide the choice of law determination are:

> (a) The needs of the interstate (and, where applicable, international) systems;
>
> (b) The relevant policies of the forum;
>
> (c) The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
>
> (d) The protection of justified expectations;
>
> (e) The basic policies underlying the particular field of law;
>
> (f) Certainty, predictability, and uniformity of result; and
>
> (g) Ease in the determination and application of the law to be applied.

Duncan, 665 S.W.2d at 421; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

These factors and considerations weigh in favor of applying Colorado law in this lawsuit.

*(1) The place where the injury occurred.* "In tort cases, the applicable law will usually be the local law of the state where the injury occurred." *Tobin*, 637 F. Supp. 2d at 412 (internal quotation omitted). Here, the accident occurred in Colorado—and this was not by chance. (A005-A006, A035-A036, A039.) The Adkison family purposely traveled to the mountains of Colorado,

12

hauling their ORVs with them on the trip, for the specific purpose of riding them there on their vacation. (A005-A006, A035-A036, A039.) And their visit to Colorado was not fleeting. The Adkisons' 2016 Colorado vacation was a week long. (A035-A039.) In fact, the Adkisons had taken ORV trips to Colorado on seven or eight prior vacations, putting literally thousands of miles on their ORVs in the state of Colorado. (A004). So unlike in some other cases—such as when an aircraft crashes in a state that it was only flying over—Colorado was "not a fortuitous location where the accident occurred." *Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 284–85 (Tex. App. 2019). To the contrary, the ORV accident occurred in Colorado because Plaintiffs took their ORVs there for the specific purpose of riding them 300–400 miles in the mountains, which they had done on seven or eight prior occasions.

*(2) The place where the conduct causing the injury occurred.* The conduct causing the injury occurred in Colorado. Other than Gary Adkison's decision not to service the transmission and brakes the previous summer in Utah, all of the decisions that led to the accident were made by Plaintiffs in Colorado. In Colorado, Plaintiffs chose: (1) to coast down a Colorado mountain in neutral gear; (2) to not stop when the brakes got hot and showed signs of failing; (3) to get out and push the vehicle down the slope of the mountain every time it lost momentum; (4) to not accept help from the pickup truck driver; (5) to not wear seatbelts or helmets; and (6) to not utilize the vehicle's door nets. In addition, Gary Adkison's conduct as the driver of the Subject RZR was investigated by the police and district attorney in Colorado.

Plaintiffs may argue that the conduct causing the injury was actually the design of the vehicle. If they do, the Subject RZR was predominantly designed in Minnesota, not Texas. More importantly, however, Texas courts have been clear that the "conduct causing the injury" factor focuses on the events leading up to the accident, not the state "where [the product] was designed

13

and manufactured." *See, e.g., Swartz v. Textron Ground Support Equipment Inc.,* No. 4:19-cv-00540, 2020 WL 4000859, at *3 (N.D. Tex. July 15, 2020), *Sulak v. Am. Eurocopter Corp.*, 901 F. Supp. 2d 834, 844 (N.D. Tex. 2012) (holding that the failure to warn arose in Hawaii because that is where the allegedly defective helicopter was operated, despite the fact that it was designed and manufactured in France).

> **(3) The domicile, residence, place of incorporation, and place of business of the parties.** While Plaintiffs are currently domiciled in Texas, Texas courts have held that the plaintiff's "place of residence[] receives less weight than the place of injury in the choice-of-law analysis." *Hooper v. Marriott Int'l, Inc.*, 979 F. Supp.2d 735, 741 (N.D. Tex. 2013) (applying Ohio law to an injury suffered by a Texas resident that occurred at an Ohio hotel). Second, Plaintiffs admitted that they very rarely ride their UTVs in Texas. Instead, they frequently took them on out-of-state trips to ride, rendering their place of residence less consequential in this case.

Defendants Polaris Industries, Inc. and Polaris Sales, Inc. are Minnesota corporations with their principal place of business in Minnesota. (A113 ¶7.)

> **(4) The place where the relationship between the parties is centered.** The parties here did not have a relevant relationship. Gary Adkison did not purchase the Subject RZR from Polaris or from a Polaris dealer. (A172 Req. No. 3.) Instead, he bought it used directly from a friend. (A172 Req.No. 3.) None of the other Plaintiffs had any relevant relationship with Polaris. As a result, this factor is inapplicable and does not impact the choice of law analysis..

The relevant policy considerations considered by Texas courts also weigh heavily in favor of applying Colorado law:

> **(a) The needs of the interstate systems.** According to the Restatement, analyzing the factors to determine the applicable law "should seek to further harmonious relations between

states and to facilitate commercial intercourse between them." RESTATEMENT (SECOND) OF
CONFLICT OF LAWS § 6 cmt. d. Here, Plaintiffs chose to travel interstate from Texas to Colorado
for the specific purpose of riding their ORVs in Colorado on vacation. (A037-A038, A009-A010,
A114 ¶10.) Such interstate commerce would *not* be facilitated by ignoring Colorado's laws on
damages whenever residents of Texas or other states are injured while vacationing in Colorado.
Texas law should not follow Plaintiffs wherever they go in the United States, especially when they
travel out of state for the specific purpose of riding their ORVs several hundred miles over the
course of a weeklong vacation. Applying Texas law (or that of any state other than Colorado) to
this accident would create the inequitable result that the same accident in the same place under the
same circumstances would be treated vastly differently based solely on the home state of the people
involved. Moreover, it would inhibit Colorado's ability to pass laws governing the conduct that
takes place within its borders.

   ***(b) The relevant policies of the forum.*** While the forum state, Texas, may have "an
interest in protecting its residents in recovering adequate compensation for the wrongful death of
their relatives in foreign lands," *Toyota*, 581 S.W.3d at 289, this is *not* a case in which the law of
the other jurisdiction would be inadequate. For instance, courts in Texas have sometimes declined
to apply Mexican law on compensatory damages in cases involving accidents in Mexico because
that law "indexes the amount of recovery to the prevailing wages set by the labor law of that
nation," which are much lower than in Texas. *Id.* at 291. Here, by contrast, Colorado law would
still allow Plaintiffs to recover, if successful, very significant non-economic damages, in addition
to the possibility of receiving millions of dollars of economic damages that they are also seeking.

   ***(c) The relevant policies of the other interested state.*** Colorado has established a
clear public policy to limit runaway non-economic damages. When enacting the statute, the

15

Colorado General Assembly "declare[d] that awards in civil actions for noneconomic losses or injuries often unduly burden the economic, commercial, and personal welfare of persons in this state." COLO. REV. STAT. § 13-21-102.5(1). Enforcing Colorado law in this lawsuit would further Colorado's clear legislative aim, while enforcing Texas law would restrict Colorado's ability to effectively govern accidents that occur within its borders.

*(d) The protection of justified expectations.* Having "initiated the contact in this instance by traveling to [Colorado] . . . when Plaintiffs left Texas, [they] lacked any reasonable expectations that Texas law would govern in the event of an accident in [Colorado]." *Toyota*, 581 S.W.3d at 288. Plaintiffs chose to vacation and operate their ORVs in Colorado and to be subject to that state's vehicle laws. They have no justified expectation that Texas law follows them to Colorado (or other states) every time they travel there on their ORV trips Plaintiffs knew, or should have known, that their actions while driving their cars and their UTVs in Colorado were governed by Colorado law. It should come as no surprise, then, that Colorado law would apply to their accident.

*(e) The basic policies underlying the particular field of law.* The basic policies that apply here are the policies of adequately compensating tort victims while giving potential defendants some predictability about their total potential exposure. The Colorado legislature thoughtfully addressed both these policies by crafting their statute "to protect individual defendants from excessive noneconomic damage verdicts, [but] not to deprive injured plaintiffs from recovering compensation for their damages." *Niemet*, 866 P.2d at 1364.

*(f) Certainty, predictability, and uniformity of result.* As described above, Colorado law was intentionally designed to provide certainty, predictability, and uniformity of result. Under Colorado law, a defendant like Polaris knows exactly what its maximum potential

exposure to non-economic damages will be. Texas law does not provide the same certainty or predictability. Moreover, applying Colorado law increases the uniformity of results: Plaintiffs' claims will not be treated significantly differently than the claims of any other individual who have accidents in Colorado.

(g) *Ease in the determination and application of the law to be applied.* Colorado law on non-economic damages is very easy to determine because it is set forth specifically in a statute. The application of the statute is likewise easy—it is a straightforward monetary cap. Any non-economic damages in excess of the cap would simply be reduced to the statutory maximum. Texas law, on the other hand, because it does not have clear statutory limits on non-economic damages, could require the Court to address difficult questions about other limits on non-economic damages, such as evidentiary or constitutional limits. This is particularly true here, where one of Plaintiffs' experts opines that each relative of a decedent is entitled to recover $0.01 for every remaining second of their waking life, totaling over $79 million. Applying Texas law could invite these difficult constitutional questions into the case, whereas applying Colorado law would avoid them.

For this and the reasons set forth above, the Court should rule that Colorado law applies to Plaintiffs' claims in this case.

## II.    PLAINTIFFS' CLAIM FOR EXEMPLARY DAMAGES IS NOT RECOVERABLE UNDER COLORADO (OR TEXAS) LAW.

Polaris is entitled to summary judgment on Plaintiffs' claims for exemplary damages because there is no evidence in the record that Polaris committed "fraud, malice, or willful and wanton conduct" that resulted in Plaintiffs' damages. COLO. REV. STAT. §§ 13-21-102(1)(a), 13-21-203(3)(a). In fact, Plaintiffs have not even alleged, much less come forward with evidence of, fraud or malice on the part of Polaris. Nor is there evidence of Polaris exhibiting "willful and

17

wanton conduct," which Colorado statute defines as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." COLO. REV. STAT. § 13-21-102(1)(b). According to the Colorado Supreme Court, to satisfy the statutory requirement of proving willful and wanton conduct, Plaintiff must demonstrate that the Defendant "knew or should have known that injury **would** result" from its conduct." *Grabau v. Target Corp.*, No. 06-cv-01308, 2008 WL 179442, at * 7 (D. Colo. Jan. 17, 2008) (emphasis added) (quoting *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005)). Here, far from showing willful and wanton conduct, the record evidence demonstrates that Polaris took reasonable precautions in designing, testing, and warning about how to use—and how *not* to use—its product.[4]

### A.    Polaris Extensively Tested Its Products To Protect Riders' Safety.

Polaris spent *thousands* of hours each year testing the safety of its vehicles. (A186.) This safety testing included specific tests for stability, braking, and occupant protection. (A186.) Polaris actually tested the brakes on this model line for the issue involved in this lawsuit—aggressive braking. (A186.) Polaris's testing included high-temperature brake operation to the point at which the brake fluid and brake pad adhesives experience deterioration. (A136-A138, A186.) This evidence indicates that, far from acting "heedlessly and recklessly, without regard to

---

[4] Even if Texas law applied to exemplary damages, which it does not, summary judgment should still be granted because there is no evidence demonstrating that Polaris acted with "gross negligence" in the design of the Subject RZR. TEX. CIV. PRAC. & REM. CODE § 41.003(a). Under Texas law, gross negligence consists of two elements, one objective and one subjective. *Morris v. Cessna Aircraft Co.*, 833 F. Supp. 2d 622, 639. (N.D. Tex. 2011). "The objective element requires that the act or omission complained of be one 'which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others.'" *Id.* (quoting § 41.001(11)(A)). "The subjective element of gross negligence requires that the act or omission be one 'of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.'" *Id.* (quoting § 41.001(11)(B)). As shown below, Plaintiffs have come forth with no evidence of gross negligence. In fact, the undisputed record evidence establishes that Polaris took reasonable precautions in designing, testing, and warning about its product.

consequences" (COLO. REV. STAT. § 13-21-102(1)(b)), Polaris carefully and thoughtfully tested its vehicles to ensure their safety. Even if Plaintiffs could show that this testing was somehow flawed—which they cannot—that still would not be sufficient to create a triable issue on whether Polaris undertook willful on wanton conduct. *See Wollam v. Wright Med. Grp., Inc.*, No 1:10-cv-3104-DME-BNB, 2012 WL 4510695, at * 11 (D. Colo. Sept. 30, 2012) (evidence of allegedly improper testing did not rise to the level of willful and wanton conduct).

## B.    Polaris Remedied The Earlier Transmission Lock-Up Issue.

As described above, certain of Polaris's RZRs experienced a "lock-up" on the newly-designed, model-year 2010 transmission. Once Polaris discovered the problem, it promptly: (1) reverted to installing the model-year 2009 transmission on RZRs that had yet to be assembled, and (2) redesigned the transmission for future model years. Polaris's remedial efforts refute any suggestion that it acted recklessly in regard to the transmission design or to the safety of its customers. *See Wollam*, No. 1:10-cv-3104-DME-BNB, 2012 WL 4510695, at * 11 (failing to stop distributing and notify surgeons about a small percentage of hip replacement systems that had fractured did not raise a triable issue as to willful and wanton conduct).  Moreover, the 2010 transmission issues are irrelevant to this case because the Subject RZR did not have the 2010 transmission that experienced "lock-up" issues.  Rather, it had the improved transmission design used in the 2011 model-year RZRs.

## C.    Polaris Provided Proper Warnings That, If Heeded, Would Have Prevented Plaintiffs' Accident.

While Plaintiff must prove that Polaris acted willfully and wantonly towards its riders safety to be eligible for exemplary damages, the evidence plainly shows that Polaris gave clear and explicit warnings to consumers, both in the owner's manual and in the vehicle itself, for the purpose of protecting riders' safety. (A083-A104.) These warnings included the following:

19

- Get off and walk if conditions require (A102.)

- Improperly descending a hill could cause loss of control and overturn (A090.)

- Always descend down a hill with the transmission in forward gear (A090, A105.)

- Never descend down a hill with the transmission in neutral (A090, A105.)

- Never travel down a hill at high speed (A090, A105.)

- Apply the brakes *lightly* to aid in slowing (A105.)

- Always wear seatbelts (A098, A102, A103.)

- Always wear helmets and protective gear (A083, A086, A100, A101.)

- Always use the vehicle's door nets (A098.)

Plaintiffs ignored every single one of these warnings.  Had Plaintiffs followed Polaris's warnings, the accident and injuries would have been avoided. Any recklessness here was not on the part of Polaris, which expressly and unambiguously warned Plaintiffs not to engage in the very conduct that caused their injuries.

For this and the reasons set forth above, the Court should dismiss Plaintiffs' claim for exemplary damages.

## III.   PLAINTIFFS' CLAIMS REGARDING THE ALLEGED TRANSMISSION FAILURE SHOULD BE DISMISSED AS A MATTER OF LAW.

### A.   Texas Law Requires Plaintiffs to Prove That The Transmission Lock-Up Was Both A Cause in Fact and The Proximate Cause of the Accident.

Each of Plaintiffs' three claims against Polaris require them to prove causation—that Polaris's conduct caused their injuries.[5]

---

[5] This brief cites to Texas law because there is no apparent conflict between Texas and Colorado law on the issue of causation. When no conflict exists between the laws of the two states, the court applies the law of the forum state. *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).

To prove their design defect and marketing defect claims, Plaintiffs must prove that the alleged defect was a "producing cause" of the accident.  TEX. CIV. PRAC. & REM. CODE § 82.005(a)(2). The producing cause is the "cause in fact" of the harm, meaning that a "defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct." *G.M.C. v. Harper,* 61 S.W.3d 118, 131 (Tex. App. 2001). *Shaw v. Trinity Highway Prods., LLC*, 329 S.W.3d 914, 919 (Tex. App. 2010) (affirming summary judgment where there was "no more than a scintilla of evidence" that the marketing defect was the "producing cause" of the damages).

To prove their negligence claim, Plaintiffs must show that their damages were "proximately caused" by defendant's breach of duty. *IHS Cedars Treatment Ctr of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004). "The components of proximate cause are [1] cause in fact and [2] foreseeability." *Rampersad v. CenterPoint Energy Hous. Elec., LLC*, 554 S.W.3d 29, 33 (Tex. App. 2017). "[C]ause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *IHS Cedars*, 143 S.W.3d at 799. Foreseeability "requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Id.* "Conjecture, guess, and speculation are insufficient to prove cause in fact and foreseeability." *Id.* Both cause in fact and foreseeability may be decided as a matter of law on summary judgment. *See, e.g.*, *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (affirming summary judgment in product liability and negligence case on the grounds of causation).

### B.      The Transmission Lock-Up Was Not A Cause In Fact Of The Accident.

As a matter of law, the transmission lock-up was not a cause in fact of Plaintiffs' accident. "[C]ause in fact is not established where the defendant's negligence does no more than furnish a

condition which makes the injuries possible" or when "the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm." *IHS Cedars*, 143 S.W.3d at 799. "[E]ven if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause." *Rampersad,* 554 S.W.3d at 33. Among other factors, Courts look at "the passage of time, geographical remoteness to the accident, and the conduct of independent agencies" to determine whether the alleged defect was a cause in fact of the injuries. *Id*. At 38.

First, the transmission lock-up merely "furnished the condition" that made Plaintiffs' injuries possible. The lock-up, itself, did not injure the Plaintiffs. When it occurred, the vehicle came to a standstill and Plaintiffs exited the vehicle unharmed. It was Plaintiffs' actions after the vehicle locked-up that caused the accident. Second, the accident occurred likely an hour or more after the Subject RZR locked-up and approximately 2.5 miles away from the site where it locked up. Moreover, the accident occurred only after the Plaintiffs affirmatively decided to coast down the mountain in neutral in a disabled vehicle (violating of both Colorado law against coasting on a downgrade and the vehicle's warnings) even after Gary Adkison recognized that the brakes were overheating and fading and despite the fact that Plaintiffs had multiple opportunities to either walk down the mountain or get a ride from a truck driver that they passed along the way.

Therefore, as a matter of law, due to "the passage of time, geographical remoteness to the accident, and the conduct of [Plaintiffs]," the lock-up cannot be considered a cause in fact of Plaintiffs' injuries. *Rampersad,* 554 S.W.3d at 38.

### C.     The Accident Was Not A Foreseeable Result Of The Transmission Lock-Up.

Plaintiffs' negligence claim also requires them to prove that this accident was a foreseeable

22

result of a transmission failure. *IHS Cedars*, 143 S.W.3d at 798. As a matter of law, Plaintiffs cannot do so for three reasons: (1) Polaris could not reasonably foresee that Plaintiffs would coast down a steep mountain pass in neutral for miles after their transmission locked up, in violation of both the law and the product's warnings; (2) the forces generated by the transmission lock-up had come to rest without injury or accident well-before Plaintiffs decided to coast down the mountain; and (3) Plaintiffs' reckless decision to drive down the mountain in an inoperable vehicle was an intervening and superseding cause of their injuries.

### a.     This Type of Accident is not a Reasonably Foreseeable Result of A Transmission Lock-Up.

"The question of foreseeability, and proximate cause generally, involves a practical inquiry based on 'common experience applied to human conduct.'" *Rampersad*, 554 S.W.3d at 33 (quoting *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987)). "Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant should have anticipated that his conduct would bring about an injury." *Id.* Rather, "[i]t asks whether the injury 'might *reasonably* have been contemplated' as a result of the defendant's conduct. *Id.* (quoting *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980) (emphasis added)).

Polaris could not reasonably foresee that, after the Subject RZR's transmission locked up, Plaintiffs would decide to coast in neutral down a steep mountain path in an inoperable vehicle until the brakes failed and the driver lost control. In fact, there is no record evidence that Polaris was aware of *any* prior instances of a transmission lock-up that resulted in brake failure. That makes sense. When a vehicle's transmission fails, it comes to a stop and the wheels will not turn while the vehicle is in gear. Polaris could not have reasonably foreseen that a transmission lock-up would lead the series of negligent and reckless decisions undertaken by Plaintiffs prior to the

23

accident. Specifically, for Polaris to foresee that a transmission lock-up would cause brake failure and an accident like this one, it would have had to foresee that: (1) Plaintiffs would decide to coast down a treacherous mountain pass in an inoperable vehicle, in violation of Colorado law and its clear safety warnings; (2) Plaintiffs would chose not to properly service and maintain the brakes, despite being informed that the brake pads needed to be replaced a year prior to the accident; and (3) Plaintiffs would ride the vehicle's brakes excessively to the point of brake failure, despite recognizing multiple indications that the brakes were getting "soft," "spongy", and likely to give out and having multiple opportunities to stop the vehicle.

Because brake failure leading to an accident is not a foreseeable result of a transmission lock-up, Plaintiffs cannot establish foreseeability or proximate cause with respect to their transmission claims.

### b.   Foreseeability Is Negated Because The Forces Generated By The Transmission Lock-Up Had Come To Rest Without Injury.

Foreseeability is negated when, as here, "the forces generated by the negligent act had come to rest without injury to anyone." *Rampersad,* 554 S.W.3d at 40. After the Subject RZR's transmission locked up, the engine was inoperable, the vehicle was at a standstill, and the Plaintiffs were uninjured. In other words, "the forces generated by the [transmission lock-up] had come to rest without injury to anyone." *Rampersad,* 554 S.W.3d at 40. It was other, independent and subsequent forces—specifically, Plaintiffs' decisions to continue riding the disabled vehicle down the mountain—that caused the accident. Plaintiffs' injuries would never have occurred without "the negligent act of an independent agency," in this instance, Gary Adkison's repeated reckless decisions to continue coasting the vehicle down the mountain. *Bell v. Campbell*, 434 S.W.2d 117, 122 (Texas 1968). Therefore, as a matter of law, the transmission lock-up cannot be the proximate cause of Plaintiffs' injuries.

### c.     *Plaintiffs' Decision To Coast Down The Mountain In Neutral Was A Superseding Cause Of The Accident.*

Plaintiffs' decision to coast down the mountain after the transmission locked up was an intervening and superseding cause of the accident, which negates foreseeability as a matter of law. Foreseeability may be negated on summary judgment when an intervening force rises to the level of a "new and independent" or "superseding" cause of the plaintiff's injury. *Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999). "[A] new and independent, or superseding, cause may intervene between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause." *Rampersad,* 554 S.W.3d at 34 (quotation omitted). A new and independent cause thus "destroys the causal connection between the defendant's negligence and the plaintiff's harm, precluding the plaintiff from establishing the defendant's negligence as a proximate cause." *Id.*

Texas courts have regularly "relied on the Restatement in the past to aid [them] in determining when an intervening force rises to the level of a new and independent or superseding cause." *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006) (citing *Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999)). Section 442 of the Restatement identifies the following factors to be considered in determining whether an intervening force is a superseding cause:

> (a) The fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) The fact that the intervening force's operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of the force's operation;
>
> (c) The fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

25

(d) The fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) The fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) The degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Phan Son Van*, 990 S.W.2d at 754 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)); *see also Cowart*, 20 S.W.3d at 783 (affirming summary judgment on proximate cause). When applied here, these factors demonstrate that Plaintiffs' conduct was a superseding cause of the accident, which negates foreseeability and proximate cause.

### i.      Plaintiffs' Conduct Brought About A Different Kind Of Harm Than The Transmission Lock-Up Otherwise Would Have.

The harm brought about by the transmission lock-up was the inconvenience of having a disabled vehicle that could not be driven. Had the Plaintiffs walked down the mountain or accepted the ride down, the accident would never have occurred and no one would have been harmed. Instead, Plaintiffs' decisions and conduct—coasting in neutral down a mountain, ignoring the indications that the brakes were failing, and deciding not to wear seatbelts or helmets—brought about serious physical injury and death. Such harms are significantly "different in kind." *Phan Son Van*, 990 S.W.2d at 754.

### ii.     Plaintiffs' Reckless Decisions Were Extraordinary, Not Normal.

The series of decisions by Plaintiffs that ultimately led to their accident appear, after the event, to be extraordinary rather than normal. As stated above, a normal reaction to a transmission lock-up is to walk down the mountain or call for help and then to get the vehicle fixed. It is not normal or reasonable to coast an inoperable vehicle down a steep mountain trail in violation of

26

Colorado law and at great and obvious risk when they had multiple safe ways down the mountain or to repeatedly ignore indications that the vehicle's brakes of the vehicle were getting "spongy."

### iii.    Plaintiffs' Accident Is Not The Normal Result Of The Situation Created By The Transmission Lock-Up.

The "situation created by" the transmission lock-up was that Plaintiffs were safely situated at the top of the mountain with an inoperable vehicle whose wheels would not turn while in gear. The "normal result of such a situation" is that Plaintiffs walk down the mountain to the main road, call for assistance, or accept a ride from a passing pickup truck driver who offered to help them. Deciding—on multiple occasions—to coast down a mountain at great risk with fading brakes and without the use of their safety equipment is *not* the normal result of a transmission lock-up.

### iv.    Plaintiffs' Accident Was Caused By Their Careless Decisions and Reckless Actions.

As discussed above, this accident was caused by multiple reckless decisions affirmatively made by Plaintiffs after the transmission locked-up and the vehicle came to a stop.

### v.    Plaintiff Gary Adkison's Decision To Coast Down The Mountain Was Wrongful And Subjects Him To Liability.

As set forth in Polaris's counterclaim, Plaintiff Gary Adkison was negligent in driving the Subject RZR down the mountain after the transmission locked-up and after noticing that the brakes were starting to fail. According to the Sherriff's Report, Mr. Adkison admitted shortly after the accident that coasting down the mountain was a "stupid idea" and stated that he "killed his son." His negligence subjects him to liability in this action.

### vi.    Plaintiff Gary Adkison's Decision To Coast Down The Mountain In Neutral Is Highly Culpable.

In addition to Mr. Adkison's liability in tort, his conduct on the day of the accident after the transmission locked-up was also criminally culpable. As demonstrated above, Mr. Adkison

27

violated Colo. Rev. Stat. § 42-4-1009 by coasting on a downgrade with the transmission in neutral. He also violated Colo. Rev. Stat. § 42-4-1402 by operating the Subject RZR in a careless manner. In fact, the Colorado police recommended that Mr. Adkison be charged with two counts of careless driving causing death in violation of Colo. Rev. Stat. § 42-4-1402(c)) and one count of careless driving causing bodily injury in violation of Colo. Rev. Stat. § 42-4-1402(b)). (A107, A069.)

The Restatement factors as applied here demonstrate that Plaintiffs' conduct rises to the level of a superseding cause, which negates foreseeability and proximate cause as a matter of law. *Phan Son Van*, 990 S.W.2d at 754.

### D.      Plaintiffs Cannot Prove Their Marketing Defect Claim.

To maintain their marketing defect claim, Plaintiffs must show a "causative nexus" between the alleged failure to warn and the plaintiff's injury. *Shaw*, 329 S.W.3d at 919. There is no evidence showing that Polaris failed to provide appropriate warnings related to the transmission or that different warnings would have prevented this accident. To the contrary, Polaris provided clear and adequate warnings against coasting down a mountain in neutral, traveling downhill at a high rate of speed, failing to maintain the vehicle's brakes and transmission, and failing to wear seatbelts or helmets. Plaintiffs ignored all of those warnings. Far from demonstrating a marketing defect or failure to warn, the record evidence demonstrates that Plaintiffs willingly ignored the warnings that they were provided.  As a result, their marketing defect claim should be dismissed.

### CONCLUSION

For all these reasons, Polaris respectfully requests that the Court enter partial summary judgment in favor of Polaris that: (a) Colorado law applies to Plaintiffs' claims; and (b) Plaintiffs' claims for exemplary damages are dismissed; and (c) Plaintiffs' design defect, marketing defect,

and negligence claims are dismissed insofar as they are based on Plaintiffs' theory that the transmission was defective.

Respectfully submitted,

Date: May 14, 2021

   /s/ Dawn M. Beery          
DAWN M. BEERY
*(Admitted Pro Hac Vice)*
BENESCH, FRIEDLANDER, COPLAN &
  ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone:  (312) 212-4949
dbeery@beneschlaw.com


JOHNATHAN B. SKIDMORE
KATHERINE P. LETT
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
jon.skidmore@nortonrosefulbright.com
katherine.lett@nortonrosefulbright.com

*Attorneys for Polaris Industries Inc. and
Polaris Sales, Inc.*

29

## CERTIFICATE OF SERVICE

      I hereby certify that on this the 14th day of May, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to each counsel of record.  To the extent any such counsel is not registered for such electronic delivery, the foregoing document will be served in accordance with the Federal Rules of Civil Procedure.

               /s/ Dawn M. Beery
               Dawn M. Beery

14588234 v1